IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**SCOTT W.,**

      **Plaintiff,**

                                                                               **Civil Action 2:20-cv-5789**

   **v.**                                                           **Judge Sarah D. Morrison**
                                                             **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF**
**SOCIAL SECURITY,**

      **Defendant.**

**REPORT AND RECOMMENDATION**

Plaintiff brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for period of disability and disability insurance benefits.  This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 19), the Commissioner's Memorandum in Opposition (ECF No. 24), and the administrative record (ECF No. 12).  For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

                                        **I.    BACKGROUND**

Plaintiff filed his application for benefits on February 1, 2018, alleging that he has been disabled since October 30, 2017.  (R. at 184-188.)  Plaintiff's application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.  On October 22, 2019, ALJ Kathleen Kadlec (the "ALJ") held a hearing at which Plaintiff, represented by counsel, appeared and testified.  (R. at 31-74.)  The ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act on November 21,

2019. (R. at 12-30). On December 14, 2019, Plaintiff filed a Request for Review of Hearing Decision Order. (R. at 181-183.) The Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. at 1-6.) Then, on November 6, 2020, Plaintiff timely commenced the instant action. (ECF No. 1.)

## II. HEARING TESTIMONY

The ALJ summarized Plaintiff's statements to the Agency and his relevant hearing testimony as follows:

> [Plaintiff] testified that his mind is not what it used to be and he has a difficult time understanding.
>
> \*\*\*
>
> [Plaintiff] testified that he is unable to work because his job required using the computer, which would mean making adjustments due to his past neck fusion, and because he could not use his left arm to reach the keyboard. He also stated that his mind is not what it used to be and indicated he had difficulty remembering. He also testified that his left arm goes numb. He stated that he originally injured his left elbow several years ago in a car accident but fell in 2017 and reinjured it. After that, he required an elbow replacement that improved movement in his hand but caused new pain. He described his pain as 2-3/10 on average and while he has had injections for pain, they never helped. He indicated that he is not getting treatment for his neck because his doctor told him there is nothing that could be done. He testified that his wife helps him shave and button his shirt. He stated that he does the laundry because he uses a basket with wheels, and he can water plants and clean up yard waste. He also testified that he cannot stand more than 10-15 minutes due to hip pain and indicated he cannot sit at a computer due to hip and arm pain. He indicated that his balance decreased after his neck surgery and reported hitting his head multiple times.
>
> \*\*\*
>
> While [Plaintiff] testified that he is unable to stand for more than 10-15 minutes, he also testified that he could do laundry, water plants and clean up yard waste. Additionally, while he testified that he has numbness in his hand, he testified that he could still lift approximately twenty pounds. Records also show that [Plaintiff] reported taking drives to upstate New York while other records indicate that he drives often.

(R. at 19, 21-22 (internal citations omitted).)

### III. RELEVANT MEDICAL RECORDS

The ALJ summarized the relevant medical records concerning Plaintiff's alleged impairments as follows:

> There is evidence and testimony [Plaintiff] contends with other impairments such as diabetes mellitus, traumatic brain injury, degenerative changes of the right knee, nasal fracture and substance abuse. However, there were no significant objective medical findings in the record to support more than minimal limitations on [Plaintiff's] ability to perform work activities arising from these claimed impairments. In particular, the diabetes was noted to be without complication. Records also show [Plaintiff] sustained a traumatic brain injury well before his alleged onset date and was still able to work. An x-ray taken of [Plaintiff's] right knee showed only mild degenerative findings. Records also show that [Plaintiff] sustained a nasal fracture prior to his alleged onset date which did not appear to cause any work related limitations. With regard to [Plaintiff's] history of substance abuse, including a history of alcohol abuse and driving under the influence, he reported that he attended alcoholic's anonymous and does not currently use any substances. The evidence does not indicate that this has resulted in any work-related limitations. In all, these impairments did not significantly limit [Plaintiff's] mental or physical ability to perform work related activities it was determined by the undersigned to be "non-severe." Accordingly, the undersigned is not addressing the impairments in this decision.
>
> ***
>
> [Plaintiff's] medically determinable mental impairments of depression and anxiety do not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities and is therefore nonsevere. Records prior to [Plaintiff's] alleged onset date show that he was being prescribed Effexor by his primary care provider for depression. Despite taking Effexor throughout his alleged period of disability, records show no significant psychiatric complaints and some records show [Plaintiff] denied depression.
>
> At a psychological consultative exam, [Plaintiff] reported that his Effexor was helpful. On exam, he exhibited alert and responsive behavior and had no difficulty concentrating. He also had logical thought processes and was estimated to have average intellectual functioning. He was assessed as being stable at that time. It was not until June 2019 that [Plaintiff] complained of increased depression and anxiety. At the time, he reported that he had lost both of his parents and was having difficulty remembering. He was given a psychology referral at this time. He started receiving treatment for anxiety and depression at Grove City Psychological Services a few days later. On exam, he had a sad, anxious affect and mildly anxious mood but also

had thought process, perception, insight, speech, judgement, orientation and thought content all within normal limits. Additional mental status exams in the record also show findings mostly within normal limits. In all, the record does not show that [Plaintiff] ever required inpatient mental health treatment, and he did not present to the ER due to substance abuse, suicidal or homicidal ideation, or any other psychiatric symptoms.

\*\*\*

[Plaintiff] alleged disability due to brain damage affecting his left side motor and sensory cortex, broken and dislocated left hip, crushed left elbow, herniated disc surgery, full anterior and posterior neck fusion, inoperable scar tissue on the cervical spinal cord, chronic pain, depression and congenitally narrow spine spinal cord. He reported that he applied for disability based on his employer's and his own recommendation. In July 2018, he also reported that he has some difficulty with personal hygiene due to decreased range of motion that caused difficulty primarily looking down and upward. He also indicated that he has to dress in a seated position and stated that he does not do much in the way of chores. He further reported that he has difficulty with stairs because he has difficulty looking down. He indicated that he shops infrequently and drives but with some difficulty. He stated that he could walk a quarter mile and lift about twenty pounds.

[Plaintiff] testified that he is unable to work because his job required using the computer, which would mean making adjustments due to his past neck fusion, and because he could not use his left arm to reach the keyboard. He also stated that his mind is not what it used to be and indicated he had difficulty remembering. He also testified that his left arm goes numb. He stated that he originally injured his left elbow several years ago in a car accident but fell in 2017 and reinjured it. After that, he required an elbow replacement that improved movement in his hand but caused new pain. He described his pain as 2-3/10 on average and while he has had injections for pain, they never helped. He indicated that he is not getting treatment for his neck because his doctor told him there is nothing that could be done. He testified that his wife helps him shave and button his shirt. He stated that he does the laundry because he uses a basket with wheels, and he can water plants and clean up yard waste. He also testified that he cannot stand more than 10-15 minutes due to hip pain and indicated he cannot sit at a computer due to hip and arm pain. He indicated that his balance decreased after his neck surgery and reported hitting his head multiple times.

[Plaintiff's] reports of daily activities do not clearly support a finding that his functioning was reduced below the functional level indicated. While [Plaintiff] testified that he is unable to stand for more than 10-15 minutes, he also testified that he could do laundry, water plants and clean up yard waste. Additionally, while he testified that he has numbness in his hand, he testified that he could still lift approximately twenty pounds. Records also show that [Plaintiff] reported taking drives to upstate New York while other records indicate that he drives often.

Records also indicate that he was looking for work but could not find a job, indicating he believed he was able to perform work activity. Finally, while he reported difficulty understanding, he had no difficulty understanding the questions asked at a consultative exam and was able to appropriately perform serial sevens.

Records from October 2017 show [Plaintiff] presented to the emergency room at Riverside Methodist Hospital due to left elbow pain. These records show [Plaintiff] had underwent a fusion in his left elbow following a motor vehicle accident in the 1980's. On exam, he had tenderness to palpation of the left distal humerus. He also had 2+ radial pulses with intact sensation in the medial, radial and ulnar nerve distribution of the left hand, along with intact motor function. He underwent an x-ray of his left elbow at this time that revealed acute mildly displaced comminuted, intra-articular fracture of the distal humerus traversing the humeral condyles and epicondyles. He was ultimately put in a splint, prescribed Percocet and advised to follow up with his orthopedist.

Records from early November 2017 show [Plaintiff] also saw orthopedist, Joseph Mileti MD. At the time, the plan was to treat [Plaintiff's] fracture non-operatively. Records from that same day show [Plaintiff] followed up with his primary care physician as well. It was noted at this time that [Plaintiff] would be getting a hard cast. Orthopedic records show [Plaintiff] had a cast applied the following week. At the time, [Plaintiff] reported that his pain had improved, noting he was not having much pain at all. [Plaintiff] followed up with his orthopedist in late-November 2017. At the time, he reported that he had experienced some increased pain the last few days. On exam, he showed range of motion in his hand without much difficulty. Additionally, an x-ray showed everything in relatively good alignment.

Records from December 2017 show [Plaintiff] started occupational therapy. Other records around that time show [Plaintiff] received an MRI of his cervical spine that revealed extensive postsurgical changes, no recurrent canal stenosis but some myelomalacia in the cord at C-6. Records from January 2018 show [Plaintiff] still had some elbow pain but was most focused on pain he was experiencing in his wrist. By February 2018, [Plaintiff] reported that his wrist was now better but his elbow was hurting again. On exam, he had limited range of motion in of 70-90 degrees in his left upper extremity, which was noted to be his baseline since his motor vehicle accident several years ago. Records from March 2018 show [Plaintiff] underwent a CT on his fracture that showed it was not healing.

By late March 2018, [Plaintiff] reported he was still having significant pain and difficulty and wanted to know if something else could be done. It was noted the [Plaintiff's] problem was complex due to his previous fusion so Dr. Mileti wanted to get an additional opinion from another doctor. Dr. Mileti also prescribed [Plaintiff] opioids for pain at this time. In addition to his elbow impairment, records from April 2018 show [Plaintiff] continued to treat for cervical myelopathy, which was causing chronic imbalance. At this time, an exam showed normal stance and gait, normal attention and concentration and normal face symmetry and eye

movements. Records from May 2018 show [Plaintiff] underwent open treatment of left supracondylar humerus nonunion with left total elbow arthroplasty. Follow up records the next week show [Plaintiff's] pain was controlled and he was doing well. An x-ray taken at that time showed [Plaintiff's] arthroplasty was in good position without complication. In June 2018, [Plaintiff] began occupational therapy.

[Plaintiff] attended an internal consultative exam in July 2018. At the time, he reported problems with personal hygiene related to limited range of motion. An x-ray of the left elbow showed surgical hardware present within the proximal ulna. There was also some demineralization and post-traumatic arthritis noted in the elbow joint. However, there did not appear to be any significant muscle atrophy or soft tissue swelling. It was also noted that he had decreased range of motion, especially with extension and had limited flexion in his cervical spine.

By November 2018, records show [Plaintiff] decided that he would discontinue occupational therapy. These records also indicate [Plaintiff] was still having a little pain which was discouraging but his therapist was hopeful it would go away. It was also noted [Plaintiff] reported that he was aware he would need to lift less than he had been because he wanted to be sure his elbow replacement lasted. He also had reduced range of motion in the cervical spine, particularly in extension and flexion and mildly reduced right and left lateral flexion.

By June 2019, records indicate [Plaintiff's] elbow was doing well, though he had occasional pain with prono-supination. Records from July 2019 show [Plaintiff] reported being frustrated with constant low-level pain and instability when walking. On exam, his neck was stiff and he had had paraspinal tenderness. [Plaintiff] continued to describe feeling irritable due to low-level pain and reported left side body numbness in August 2019. Records from October 2019 show [Plaintiff] described his pain at 2-2.5/10. These records also show [Plaintiff] reported that he had been traveling and drove to upstate New York with his wife. [Plaintiff] did not present in any acute distress, which indicates that his relatively low level of reported pain did not interfere with ability to focus on tasks. Records during this time also indicate that [Plaintiff] reported only a constant ache is his elbow but that it was not limiting his daily functioning.

(R. at 17-19, 21-23 (internal citations omitted).)

## IV. ADMINISTRATIVE DECISION

On November 21, 2019, the ALJ issued her decision. (R. at 12-30.) First, the ALJ found that Plaintiff meets the insured status requirements of the Social Security Act through December

31, 2021. (R. at 17.) At step one of the sequential evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantially gainful activity since October 30, 2017, the alleged onset date. (*Id.*) The ALJ then found that Plaintiff had the severe impairments of closed humerus fracture of the left arm and degenerative disc disease of the cervical spine. (*Id.*) She further found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20.) At step four of the sequential process, the ALJ set forth Plaintiff's residual functional capacity ("RFC") as follows:

> After careful consideration of the entire record, the undersigned finds that [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except he can lift ten pounds occasionally; less than ten pounds frequently; carry ten pounds occasionally; can carry less than ten pounds frequently; can sit for six hours; can stand and walk for two hours; can push and pull as much as he can lift and carry; can operate foot occasionally with the left lower extremity; can operate hand controls with the left hand frequently; can occasionally reach overhead with the bilateral upper extremities; can frequently reach in all other directions with the left upper extremity; can frequently handle, finger and feel with the left upper extremity; can occasionally climb ramps, stairs, ladders, ropes and scaffolds; can occasionally stoop, kneel, crouch and crawl; can

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

> never work from unprotected heights; can frequently work around moving mechanical parts; can frequently operate a motor vehicle and can occasionally work in vibration.

(R. at 20-21.) As for medical opinions, the ALJ found as follows:

> The State Agency medical consultant's indicated [Plaintiff] could perform sedentary work with limited use of the left upper extremity; no climbing of ladders, ropes or scaffolds; occasional climbing of ramps and stairs; occasional balancing, stooping, kneeling, crouching and crawling; limited bilateral overhead reaching; and should avoid concentrated exposure to wetness, vibration and hazards. These opinions are persuasive. These opinions are based upon a thorough review of the available medical records and a comprehensive understanding of agency rules and regulations. The undersigned also finds these opinions internally consistent and well supported by a reasonable explanation. These opinions are also consistent with evidence at the hearing level showing [Plaintiff's] range of motion had returned to baseline after his elbow replacement and reported pain levels of 2-2.5/10. However, the undersigned finds that evidence indicating [Plaintiff] stopped attending physical therapy and received minimal treatment for his elbow in early 2019 support [Plaintiff] could occasionally climb ladders, ropes and scaffolds. Additionally, the State agency medical consultant at reconsideration indicated [Plaintiff's] diabetes mellitus was a severe impairment. This portion of the opinion is unpersuasive as the evidence shows [Plaintiff] voiced no complaints about this impairment and records indicate it was without complication.

> The State agency psychological consultants indicated [Plaintiff's] mental health impairments were nonsevere and caused only mild limitations in [Plaintiff's] ability to understand, remember and carryout instructions; interact with others; concentrate, persist and maintain pace and adapt or mange himself. These opinions are persuasive as they are internally consistent and well supported by a reasonable explanation. These opinions are also consistent with evidence at the hearing level showing mostly normal mental status exams. However, the undersigned finds evidence that [Plaintiff] is capable of performing activities of daily living indicates [Plaintiff] has no limitations in adapting or managing himself.

> Consultative examiner, Herbert Grodner MD., indicated [Plaintiff] should avoid unprotected heights, should not climb ladders and can climb stairs but has to do so slowly. Dr. Godner also indicated [Plaintiff] has some difficulty with weight bearing and standing. This opinion is persuasive. The undersigned finds the limitations given consistent with the evidence of record, as well as Dr. Godner's own examination findings showing normal gait but some reduced range of motion. However, the undersigned finds that evidence indicating [Plaintiff] stopped attending physical therapy and received minimal treatment for his elbow in early 2019 support [Plaintiff] could occasionally climb ladders, ropes and scaffolds.

> Consultative examiner Sudhir Dubey, PsyD., indicated that [Plaintiff] understand, remember and carryout one step processes and multi-step instructions; would be able to maintain persistence and pace to carry out simple and multi-step instructions; would not have issues dealing with co-workers and supervisors and would not have issues dealing with work pressures. This opinion is persuasive, as it is consistent with the evidence of record and Dr. Dubey's own examination findings showing no difficulty with concentration or memory and normal thought processes.

(R. at 24-25 (internal citations omitted).) Relying on a vocational expert's testimony, the ALJ found that through the DLI, Plaintiff was capable of performing past relevant work as policy checker/insurance checker; accounting clerk and computer security coordinator, and that this work did not require the performance of work-related activities precluded by Plaintiff's RFC. (R. at 25.) The ALJ therefore concluded that Plaintiff was not under a disability, as defined in the Social Security Act, at any time from October 30, 2017, the alleged onset date, through the date of the ALJ's decision. (R. at 26.)

## V. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the

9

Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI. ANALYSIS

Plaintiff puts forth two assignments of error, arguing that the ALJ failed to recognize or consider Plaintiff's neuropathy/radiculopathy as a medically determinable impairment, and that the ALJ erroneously concluded that Plaintiff's anxiety and depression were not severe impairments. (ECF No. 19 at PAGEID ## 835-840.) As to the first issue, Plaintiff argues that the ALJ "summarily disregarded [Plaintiff's] neuropathy/radiculopathy, failing to mention this impairment, at all, in her analysis of severe and non-severe impairments," so the ALJ's RFC "is not supported by substantial evidence and this case should be remanded." (*Id.* at PAGEID # 837.) As to the second issue, Plaintiff argues that his anxiety and depression "have had a significant impact on [his] ability to perform basic work activities and there is substantial evidence that the [his] depression and anxiety should be considered severe impairments under the definitions provided by agency rules and regulations." (*Id.* at PAGEID # 839.) Plaintiff believes the ALJ's RFC "does not provide any consideration for these limitations," and argues

that "the ALJ used his lay opinion to determine that [Plaintiff's] mental impairments did not affect his ability to perform work." (*Id.* at PAGEID # 840.)

In response, the Commissioner argues that "[a] fair reading of the ALJ's decision as a whole shows that the ALJ conducted a thorough analysis of the record and sufficiently considered Plaintiff's impairments and related symptoms," and that "[e]ven if the Court finds that the ALJ should have articulated her finding at step two with more detail, Plaintiff fails to show the ALJ reversibly erred in concluding that he was not disabled based on the record." (ECF No. 24 at PAGEID # 854.)  The Commissioner maintains that Plaintiff "fails to cite sufficient medical evidence showing that [he] had any additional impairments that impacted his ability to work such that he required additional physical functional limitations," and argues that substantial evidence supports the ALJ's evaluation at step two of the sequential process. (*Id.* at PAGEID ## 857-858.)  The Commissioner also submits that Plaintiff has failed to meet his burden of proving that he had any "severe" mental impairments that caused more than minimal functional limitations impacting his ability to work, and argues that the ALJ "clearly acknowledged that Plaintiff alleged disability due to depression and noted medical evidence of his mental health symptoms in assessing the [RFC]." (*Id.* at PAGEID ## 859-860.)  The Commissioner concludes that "[w]hile Plaintiff points to evidence he claims show that he was diagnosed with mental impairments and had mental health symptoms, he fails to show that the ALJ erred in finding that Plaintiff's depression and anxiety impairments were 'non-severe' or that they more than minimally affected his ability to perform basic work functions." (*Id.* at PAGEID # 863.)

Plaintiff did not file a Reply brief.  Accordingly, the matter is ripe for judicial review.  The Court will discuss each of Plaintiff's arguments in turn.

11

A. **The ALJ Did Not Commit Reversible Error at Step Two by Failing to Recognize Plaintiff's Neuropathy/Radiculopathy as Medically Determinable Impairments.**

Regarding Plaintiff's first argument, the Undersigned finds that Plaintiff is mistaken that the ALJ's failure to recognize Plaintiff's neuropathy/radiculopathy as medically determinable impairments at step two of the evaluation process constitutes reversible error. As the Sixth Circuit and this Court have observed several times, step two of the evaluation process is merely meant to "screen out totally groundless claims," and it is well settled that where an ALJ "considers all of a claimant's impairments in the remaining steps of the disability determination, any perceived failure to find additional severe impairments at step two '[does] not constitute reversible error.'" *Kestel v. Comm'r of Soc. Sec.*, 756 F. App'x 593, 597 (6th Cir. 2018) (citing *Fisk v. Astrue*, 253 F. App'x 580, 583 (6th Cir. 2007) (quoting *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987))); *see also Rosshirt v. Comm'r of Soc. Sec.*, No. 2:19-CV-3280, 2020 WL 4592393, at *3 (S.D. Ohio Aug. 11, 2020) ("**Even assuming that the ALJ should have discussed plaintiff's alleged [impairment] at step two, any error from this omission was harmless**. Step two is the means by which the Commissioner screens out totally groundless claims, and is a '*de minimis* hurdle[.]'") (emphasis added; internal quotations and citations omitted).

Plaintiff argues that even though the ALJ found that Plaintiff had multiple severe impairments, "[t]he evidence of the record clearly supports a finding that [Plaintiff's] neuropathy/radiculopathy is also a medically determinable impairment," as "[i]t has more than a 'minimal effect' on his ability to perform basic work activities and the record consistently documents the diagnoses of [Plaintiff's] neuropathy/radiculopathy." (ECF No. 19 at PAGEID # 836 (citing R. at 44, 56, 468, 522, 525, 728-729).) As a preliminary matter, this suggestion is a gross mischaracterization of the record, as the only medical diagnosis of neuropathy or

12

radiculopathy in the records cited by Plaintiff was in an EMG report from April 2013, four-and-a-half years before Plaintiff's alleged onset date. (R. at 729.) Regardless, however, Plaintiff concedes that the ALJ found that Plaintiff had multiple impairments at step two of the evaluation process, and rightfully proceeded to the remaining steps of the disability determination. (R. at 17.) This ends the step two analysis which Plaintiff puts before the Court.

Even assuming, *arguendo*, that the ALJ should have discussed Plaintiff's neuropathy/radiculopathy at step two, as Plaintiff contends, such error was harmless because the ALJ expressly discussed Plaintiff's related nerve, left arm, and left hand symptoms throughout steps three and four of the disability determination:

- **R. at 21:** Noting Plaintiff's testimony that "he is unable to work because his job required using the computer . . . and because he could not use his left arm to reach the keyboard," that "his left arm goes numb," and that "he originally injured his left elbow several years ago in a car accident but fell in 2017 and reinjured it";

- **R. at 22:** Discussing records from Plaintiff's October 2017 emergency room visit to Methodist Hospital due to left elbow pain, which noted that Plaintiff "[was] not reporting any numbness or tingling in the left hand" and that he had "intact sensation in the median, radial, and ulnar nerve distribution of the left hand" with "[i]ntact motor function in the same" (citing R. at 309-315);

- **R. at 22:** Reviewing records from Plaintiff's occupational therapy sessions from December 2017 to February 2018, which showed that "he had limited range of motion [] of 70-90 degrees in his left upper extremity, which was noted to be his baseline since his motor vehicle accident several years ago" (citing R. at 390-394); and

13

- **R. at 23:** Discussing Plaintiff's reports of left side body numbness in August 2019, but noting that "his relatively low level of reported pain did not interfere with his ability to focus on tasks" and "[r]ecords during this time also indicate that [Plaintiff] reported only a constant ache [in] his elbow but that it was not limiting his daily functioning" (citing R. at 404, 538-639, 707, 773).

Plaintiff is therefore wrong to suggest that the ALJ "summarily disregarded" Plaintiff's complaints of nerve damage, numbness, or neuropathy/radiculopathy. (ECF No. 19 at PAGEID # 837.) Rather, the ALJ acknowledged and discussed Plaintiff's history with nerve symptoms related to his left arm, wrist, and hand, and the ALJ analyzed the effect those symptoms had on how she devised Plaintiff's RFC, supporting her decision with substantial evidence from the record. *Rosshirt*, 2020 WL 4592393 at *3. Accordingly, Plaintiff's first assignment of error is not well taken.

**B.  The ALJ Did Not Commit Reversible Error at Step Two by Failing to Recognize Plaintiff's Anxiety and Depression As Severe Impairments.**

Plaintiff also argues that his anxiety and depression "have had a significant impact on [his] ability to perform basic work activities and there is substantial evidence that [his] depression and anxiety should be considered severe impairments under the definitions provided by agency rules and regulations." (ECF No. 19 at PAGEID # 839 (emphasis in original).) This argument fails, however, because the ALJ *did* find that Plaintiff had two severe impairments. (R. at 17.) Where the ALJ determines that a claimant had a severe impairment at step two of the analysis, "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence." *Pompa v. Comm'r of Soc. Sec.,* 73 F. App'x 801, 803 (6th Cir. 2003). Instead, the pertinent inquiry is whether the ALJ considered the "limiting effects of all [Plaintiff's] impairment(s), even those that are not severe," in determining Plaintiff's RFC.

20 C.F.R. § 404.1545(e); *Pompa,* 73 F. App'x at 803 (rejecting Plaintiff's argument that the ALJ erred by finding that a number of her impairments were not severe where the ALJ determined that Plaintiff had at least one severe impairment and considered all of Plaintiff's impairments in her RFC assessment); *Maziarz v. Sec'y of Health & Hum. Servs.,* 837 F.2d 240, 244 (6th Cir. 1987) (same).

Plaintiff relies exclusively on the fact that he has been diagnosed with depression and anxiety, *id.* at PAGEID # 839, but "[t]he mere diagnosis of an impairment says nothing, of course, about the functional limitations flowing from that impairment." *Hill v. Kijakazi*, No. 2:20-CV-3983, 2021 WL 5027407, at *4 (S.D. Ohio Oct. 29, 2021), *report and recommendation adopted sub nom. Hill v. Comm'r of Soc. Sec.*, No. 2:20-CV-3983, 2021 WL 5323105 (S.D. Ohio Nov. 16, 2021) (citing *Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990)). To the extent Plaintiff argues that his anxiety and depression have led to "irritability, distractibility, frustration, worry, [and] insomnia," the ALJ expressly addressed those conditions in the subject decision. For example, the ALJ first discussed considered Plaintiff's history of depression and anxiety as follows:

> [Plaintiff's] medically determinable mental impairments of depression and anxiety do not cause more than minimal limitation in [Plaintiff's] ability to perform basic mental work activities and [are] therefore nonsevere. Records prior to [Plaintiff's] alleged onset date show that he was being prescribed Effexor by his primary care provider for depression. Despite taking Effexor throughout his alleged period of disability, records show no significant psychiatric complaints and some records show [Plaintiff] denied depression.
>
> At a psychological consultative exam, [Plaintiff] reported that his Effexor was helpful. On exam, he exhibited alert and responsive behavior and had no difficulty concentrating. He also had logical thought processes and was estimated to have average intellectual functioning. He was assessed as being stable at that time. It was not until June 2019 that [Plaintiff] complained of increased depression and anxiety. At the time, he reported that he had lost both of his parents and was having difficulty remembering. He was given a psychology referral at this time. He started receiving treatment for anxiety and depression at Grove City Psychological Services a few

>days later. On exam, he had a sad, anxious affect and mildly anxious mood but also had thought process, perception, insight, speech, judgement, orientation and thought content all within normal limits. Additional mental status exams in the record also show findings mostly within normal limits. In all, the record does not show that [Plaintiff] ever required inpatient mental health treatment, and he did not present to the ER due to substance abuse, suicidal or homicidal ideation, or any other psychiatric symptoms.

(R. at 18-19 (internal citations omitted).) The ALJ then reviewed the State agency psychological consultants' opinions regarding Plaintiff's mental health impairments as follows:

>The State agency psychological consultants indicated [Plaintiff's] mental health impairments were nonsevere and caused only mild limitations in [Plaintiff's] ability to understand, remember and carryout instructions; interact with others; concentrate, persist and maintain pace and adapt or mange himself. These opinions are persuasive as they are internally consistent and well supported by a reasonable explanation. These opinions are also consistent with evidence at the hearing level showing mostly normal mental status exams. However, the undersigned finds evidence that the claimant is capable of performing activities of daily living indicates [Plaintiff] has no limitations in adapting or managing himself.

(R. at 24-25 (internal citations omitted).)

Given the ALJ's extensive review of Plaintiff's mental health impairments, the Undersigned disagrees with Plaintiff's position that "it is clear that the ALJ did not consider the 'non-severe' mental health impairments when formulating the [RFC]." (ECF No. 19 at PAGEID # 840.) It is the ALJ's discussion of Plaintiff's anxiety and depression that matters, not necessarily whether the ALJ characterized those conditions as "nonsevere" or "severe" impairments. Here, the ALJ adequately accounted for Plaintiff's anxiety and depression in her RFC assessment and the decision is supported by substantial evidence. *Pompa*, 73 F. App'x at 803. Accordingly, Plaintiff's second assignment of error is not well taken.

## VII. CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED** and that the Commissioner's decision be **AFFIRMED.**

16

### VIII. PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: February 10, 2022           /s/ *Elizabeth A. Preston Deavers*
                                                              **ELIZABETH A. PRESTON DEAVERS**
                                                              **UNITED STATES MAGISTRATE JUDGE**